IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

EMILY HICKS,                          )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )     Case No.
                                      )     15-0283-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                    Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Emily Hicks seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) failing

to consider third party observations in determining credibility and residual functional

capacity, (2) failing to consider plaintiff's obesity in assessing plaintiff's residual

functional capacity, (3) relying on plaintiff's exaggerated appearance during the hearing

in determining that her testimony was not credible, and (4) finding at step five that

plaintiff could perform substantial gainful activity.  I find that the substantial evidence in

the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On July 23, 2009, plaintiff applied for disability benefits alleging that she had

been disabled since January 18, 2006.  Plaintiff's disability stems primarily from

fibromyalgia and migraine headaches.  Plaintiff's application was denied on November

10, 2009.  On March 16, 2011, a hearing was held before an Administrative Law Judge.

At the conclusion of that hearing, Administrative Law Judge Gorge Bock decided to

have a rheumatologist review plaintiff's records.  A second hearing was held on

September 21, 2011, during which Dr. Ann Winkler testified.  On October 11, 2011, the

ALJ found that plaintiff was not under a "disability" as defined in the Act.  On December

3, 2012, the Appeals Council denied plaintiff's request for review.

Plaintiff appealed to the Federal District Court, and her case was remanded on

March 10, 2014, for further consideration on the ground that the ALJ failed to consider

the statements of plaintiff's parents.  An administrative hearing was held on December

11, 2014.  On January 15, 2015, the ALJ again found plaintiff not disabled.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

3

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, vocational expert Stella Doering, and medical expert Dr. Ann Winkler, in addition to documentary evidence admitted at the hearing.

4

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income, shown in both actual and indexed figures, from 1984 through 2014:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1984 | $ 1,224.85 | $ 2,706.16 |
| 1985 | 1,815.30 | 3,846.80 |
| 1986 | 1,456.27 | 2,997.02 |
| 1987 | 1,667.94 | 3,226.85 |
| 1988 | 3,146.13 | 5,800.91 |
| 1989 | 3,177.05 | 5,634.81 |
| 1990 | 2,937.00 | 4,979.07 |
| 1991 | 3,512.25 | 5,740.37 |
| 1992 | 3,111.12 | 4,835.62 |
| 1993 | 4,133.90 | 6,370.54 |
| 1994 | 14,405.18 | 21,618.84 |
| 1995 | 23,210.10 | 33,490.56 |
| 1996 | 11,132.37 | 15,314.28 |
| 1997 | 23,062.97 | 29,977.45 |
| 1998 | 23,889.81 | 29,507.78 |
| 1999 | 27,002.20 | 31,591.54 |
| 2000 | 29,106.14 | 32,268.62 |
| 2001 | 26,493.57 | 28,687.80 |
| 2002 | 18,931.24 | 20,295.60 |
| 2003 | 0.00 | 0.00 |
| 2004 | 8,593.82 | 8,593.82 |
| 2005 | 19,312.05 | 19,312.05 |
| 2006 | 659.61 | 659.61 |
| 2007 | 0.00 | 0.00 |
| 2008 | 704.50 | 704.50 |

| | | |
|---|---|---|
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 0.00 | 0.00 |
| 2013 | 0.00 | 0.00 |
| 2014 | 0.00 | 0.00 |

(Tr. at 228-229, 1321-1330).

**Function Report**

In a Function Report dated August 13, 2009, plaintiff reported that she normally gets up at 5:00 a.m.; has breakfast; goes back to sleep; gets up to have lunch; either reads, plays on the computer, or rides a stationary bike; takes an afternoon nap; gets up at 6:00 p.m.; tries to "have contact with the outside world and family;" and then goes to bed around 10:00 p.m. (Tr. at 283). She does not need special reminders to take care of personal needs, grooming, or take medication (Tr. at 285). She prepares her own meals, usually casseroles. She loves to cook, but she is only able to do it about every two or three weeks. She is able to do laundry and clean her bathroom. She cannot reach or bend to clean the shower, she uses a spray. She has difficulty washing her hair because of her shoulder pain. She has difficulty fastening her bra and dressing because of her hands.

Plaintiff is able to drive (Tr. at 286). She tries to get out once a week for a domestic violence support group. She shops in stores for medication once every week or two for up to 10 minutes. She gets flustered using cash. She tries to do reading and writing every day. She socializes on the computer. She sometimes needs reminders to go places when she takes a lot of pain medication because it makes her "a little foggy."

6

Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, and concentrate (Tr. at 288). Her impairments do not affect her ability to understand, follow instructions, use her hands, or get along with others. Unless heavily medicated, she can pay attention "forever."

**Missouri Supplemental Questionnaire**

In this document, also dated August 13, 2009, plaintiff reported that she can use the computer for a 2- to 3-hour session, but she needs to shift, move, or get up every 5 to 15 minutes (Tr. at 310). Plaintiff stated that her costochonritis[1] does not flare up too often, but when it does it takes her breath away. She described this condition as "manageable." Her migraines "ebb and flow." Sometimes over-the-counter medication alleviates her migraines, but other times nothing will help and they go on for 4 days or more. "One time I had one for 3 months." She has problems with insomnia. She also has restless leg syndrome and sleep apnea but both are controlled (Tr. at 311).

### Disability Report Appeal

In an undated Disability Report Appeal, plaintiff noted that her conditions began worsening in October 2009 -- two months after she completed the above summarized Function Report and Missouri Supplemental Questionnaire (Tr. at 314). Beginning in October 2009, she has been in excruciating pain and she rarely gets out of bed. She sleeps 20 hours a day, and sometimes her pain causes her to toss and turn. Her doctor recently prescribed Lyrica[2] which causes extreme dizziness. Her pain level is

[1]Inflammation of the cartilage that connects a rib to the breastbone.

[2]Treats nerve pain, muscle pain, fibromyalgia, and seizures.

7

now intolerable. "Sitting in the same position for more than a minute or two causes pain." She now gets spontaneous pain surges.

Plaintiff reported that she saw Dr. Clare Reardon in September 2009 and began taking prenatal vitamins "to get me ready to try to have a child, if that's what I decide -- and feel able -- to do some day soon." (Tr. at 317, 318). Plaintiff needs help feeding her cat and taking care of him. She is no longer able to open jars due to hand pain. Standing at the stove is too difficult for her. Most of the time she misses meals because she is asleep.

**Daily Activities Questionnaire - Third Party**

On August 31, 2010, plaintiff's father completed a Daily Activities Questionnaire (Tr. at 337-340). Plaintiff sleeps most of the time every day. Her mother helps her with hygiene because plaintiff cannot bathe without great difficulty. Plaintiff's parents prepare her meals. Plaintiff cannot fix anything but cereal. Plaintiff can only shop by mail order. She does no chores. She goes out of the home once or twice a month and needs someone close by to steady her if needed. She does very limited driving and does not use public transportation. She is not able to play games. She does not listen to the radio or watch television much -- she sleeps most of the time. She has only read one book all year. Plaintiff has not attended the domestic violence support group since April 2010. She has no social activities. When she takes pain medications, she has trouble concentrating and remembering. She does not attempt projects.

8

**Daily Activities Questionnaire - Third Party**

On September 1, 2010, plaintiff's mother completed a daily activities questionnaire (Tr. at 341-344). Plaintiff typically spends her days in bed. She takes various medications to help her sleep. She seldom bathes or washes her hair; if she puts on a bra she needs help. Plaintiff's mother prepares plaintiff's meals. Plaintiff does no cooking, no shopping, no chores. She goes out of the home once or twice a month and needs no assistance when she does; she drives a car. Plaintiff seldom watches television but seems to remember what she watches. She seldom reads, but can remember what she reads. She has no social functions. Sometimes plaintiff's medications cause her to have problems concentrating or remembering. Plaintiff has hardly been out of bed since moving in with her parents in December 2008.

**B.     SUMMARY OF TESTIMONY**

There have been four administrative hearings in this case.

_March 16, 2011_

During the March 16, 2011, hearing, plaintiff testified as follows:

At the time of this hearing, plaintiff was 42 years of age and is currently 48 (Tr. at 45-46, 412). She was 5'8" tall and weighed 250 pounds (Tr. at 49). Plaintiff receives $650 per month in spousal support (Tr. at 56). She has a masters degree in Sociology (Tr. at 46). She works 15 minutes or less per day (Tr. at 46). She does not get paid; her compensation is a free apartment that would normally rent for $600 per month (Tr. at 46). It is a senior-living tax-credit building (Tr. at 46). She "makes rounds" one time each evening between 10:00 p.m. and midnight (Tr. at 47). It is a secure building and

her responsibility is to make sure the proper doors are locked and the proper lights are on (Tr. at 47). She had been doing this job for about the past 5 months (Tr. at 47).

Before getting this "job," plaintiff had not worked since January 2006 (Tr. at 49). She had to stop working due to lower back pain (Tr. at 49). Plaintiff's last job was a part-time pharmacy technician (Tr. at 49).

During most of plaintiff's day, she sleeps (Tr. at 47, 49). She is either sleeping or trying to sleep about 20 hours out of each day -- whether she is sleeping or not, she is in bed about 20 hours every day (Tr. at 49, 50). Part of the reason is pain; part is because she has insomnia which is exacerbated by her medications (Tr. at 50). Some of her medications cause her to be drowsy and "they work at cross purposes and sometimes [she's] awake all night and sometimes [she's] asleep all day and asleep all night and they do both." (Tr. at 50). Savella for fibromyalgia keeps her awake (Tr. at 50). She takes Tamazepam at night to help her sleep, but it does not always work (Tr. at 50). Even when she cannot sleep, she is trying to sleep (Tr. at 50).

Plaintiff has fibromyalgia which causes constant pain in her lower back and hips (Tr. at 50). She also has knee pain and foot pain, and she recently developed wrist and hand pain (Tr. at 50). She has TMJ[3] which is exacerbated by fibromyalgia, and she has neck pain (Tr. at 50-51). Plaintiff was diagnosed with fibromyalgia in 2001 or 2002 by Larry Rittle at the KU Pain Clinic (Tr. at 51). She now sees her primary care physician, Thomas Chapman, and a neurologist, Sarah Hon, for fibromyalgia (Tr. at 51). She has

---

[3]Plaintiff has been wearing a night guard for TMJ disorder since she was 17 years old (Tr. at 388).

never seen a rheumatologist -- no one has ever referred her to one (Tr. at 51).  "[U]ntil three months ago I understood that I was being treated by physicians who knew what they were doing and I still believe that they know what they're doing.  I'm on the most current medication that the high-powered medication that treats fibromyalgia.  I've been to pain clinics.  I've -- I'm doing what fibromyalgia patients do.  I just have a really severe case." (Tr. at 51).  Plaintiff is not taking narcotic pain medications (Tr. at 51-52).

Plaintiff saw a neuropsychologist who told her she was having trouble taking in information, which is why she is having trouble with remembering -- the information is "not there to forget" (Tr. at 52).  She is missing a lot of things because she is not able to pay attention (Tr. at 52).

Plaintiff began experiencing nausea and vomiting a few months before the hearing (Tr. at 48).  She had been having a lot of tests done -- colonoscopies, EEGs, x-rays, MRIs and CT scans (Tr. at 48).  Plaintiff suffers from nausea and vomiting daily (Tr. at 52-53).  She vomits once a day, but she feels nauseated most of the day (Tr. at 53).  Sometimes just moving makes her nausea worse (Tr. at 53).  That is another reason why she spends so much time lying down (Tr. at 53).

Plaintiff takes 17 pills a day (Tr. at 57).  She has been taking almost all of them for the past five years (Tr. at 57).  She takes Imitrex[4] (about 9 pills every 24 days) (Tr. at 57).

---

[4]Plaintiff was first diagnosed with migraines in 1998 and was prescribed Imitrex (Tr. at 387).

Plaintiff is able to drive, but does so infrequently (Tr. at 47). She does her own shopping sometimes (Tr. at 47). She goes to the doctor and to therapy (Tr. at 47-48). Plaintiff lives alone, but her parents help her do chores, cook, clean, and do laundry (Tr. at 53). Plaintiff only showers about once a week, sometimes less (Tr. at 54). It is difficult for her to stand long enough to shower (Tr. at 54). She can stand for about 10 minutes (Tr. at 54). She fidgets a lot when she sits for extended periods due to her hips and back (Tr. at 54). She cannot sit more than 10 minutes at a time (Tr. at 54). It takes her about 10 or 15 minutes to walk the four floors of the apartment building each evening, and then she has to sit in the office and do a report (Tr. at 54). She rides the elevator up to the fourth floor, and then she walks the rest of the way including down the stairs (Tr. at 55). Plaintiff can carry a gallon of milk but nothing heavier (Tr. at 55).

When asked to identify her worst problem, plaintiff said it was her inability to get out of bed every day and function normally (Tr. at 55). Her pain, confusion, and memory problems all cause that (Tr. at 55).

At the conclusion of this hearing, the ALJ indicated he would have a rheumatologist review plaintiff's records, and then he would set another hearing.

_July 25, 2011_

During the July 25, 2011, hearing, Ann Winkler, M.D., Ph.D., a rheumatologist, was to testify as a medical expert, but she had not been provided with all of plaintiff's medical records (Tr. at 62-63).

**Plaintiff's testimony.** Since her last testimony plaintiff had been to the hospital four times -- three emergency room visits and one over-night stay which resulted from one of the emergency room visits (Tr. at 69, 70). She was having muscle spasms in her chest, shortness of breath, and increased heart rate (Tr. at 69). North Kansas City Hospital performed a full cardiac workup and said her heart was OK -- they thought the problem was musculoskeletal (Tr. at 69). She saw her doctor the day before the hearing and learned that it was a costochondritis flare, which is inflammation of the cartilage in her ribs and sternum (Tr. at 69-70). Plaintiff went to the emergency room on June 21 or 22 after she fell in her apartment and injured her leg and ankle (Tr. at 70). They put her in an air cast and told her to use a walker, which she did for five days (Tr. at 70). She went to the emergency room a week and a half ago for her right hand -- it was swollen and she was in a lot of pain (Tr. at 70-71). She was told it was probably some kind of deep tissue bruise (Tr. at 71). Plaintiff has recovered from her fall, but she continues to have trouble grabbing something or opening bottles of water (Tr. at 71). She also has trouble typing (Tr. at 71). The trouble with her hand has actually been going on for almost a year -- she has wrist splints that are supposed to help with that but they don't (Tr. at 71).

Plaintiff was still working as the night manager of the senior apartment building (Tr. at 72). Her job is to be on call in the evenings and on weekends, and once each evening she walks the building to check the lights and doors (Tr. at 72-73). It takes her

Case 4:15-cv-00283-REL   Document 33   Filed 09/26/16   Page 13 of 61

about 20 minutes to do that (Tr. at 73). She was also receiving food stamps and was on Medicaid (Tr. at 72).

Plaintiff worked off and on as a pharmacy technician for several years (Tr. at 73). She was on her feet most of the day (Tr. at 73). She worked as a middle school math teacher, and was also on her feet all day performing that job (Tr. at 73). Up to 2001 she was a deputy juvenile officer and domestic relations specialist for Jackson County (Tr. at 74). A domestic relations specialist manages the divorce education curriculum, and she was a conflict resolution manager -- a mediation specialist (Tr. at 74). She worked as a custody evaluator in Kansas for five or six months, going into homes to assess situations, check on children's progress in school, and make recommendations to the court (Tr. at 74-75).

**Dr. Ann Winkler.** Dr. Winkler is a rheumatologist. She testified that plaintiff's diagnosis of fibromyalgia is accurate; however, she noted that "on several occasions, she also was tender all over, which usually suggests that there are significant psychological issues that are impacting someone in terms of their pain perception." (Tr. at 77).

Considering plaintiff's fibromyalgia and other physical impairments, plaintiff should be capable of performing at least light-duty work -- lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing or walking 6 hours per day, and sitting without limitation (Tr. at 78). She should be able to climb stairs occasionally but could never climb ladders, ropes or scaffolds (Tr. at 78). She should frequently be able to balance (Tr. at 78). She should occasionally be able to kneel, crouch, stoop, or bend

14

(Tr. at 78). She has no manipulative limitations and no visual or communicative limitations (Tr. at 78). She should avoid concentrated exposure to cold, wetness, humidity, dust, fumes, odors, and gases, and should avoid unprotected heights (Tr. at 78). The evidence established that she improved with physical therapy but was not compliant (Tr. at 78). Until her psychological problems are under better control, she will likely be impacted in terms of her ability to function on a regular basis (Tr. at 78). "[S]he has had what seems like pretty severe psychological issues, [which] probably are attacking her perception of her limits and her pain." (Tr. at 78).

_December 11, 2014_

**Plaintiff's testimony.** At the time of this hearing, plaintiff was 46 years of age (Tr. at 1196). Plaintiff was no longer working as the night manager of the apartment building (Tr. at 1197). She worked there for one year, from October of 2010, to October 2011, and received a free apartment in lieu of a paycheck (Tr. at 1197).

Plaintiff is unable to work due to pain and, more recently, cognitive issues (Tr. at 1198). She has pain primarily in her back, hips, knees and feet (Tr. at 1199). She has difficulty remembering things; she has a lot of trouble doing things that she has done for years (Tr. at 1199).

Plaintiff can stand in one place, if she is also moving, maybe up to 15 minutes (Tr. at 1199). She is afraid of falling; steadiness is an issue (Tr. at 1199). She can sit for 15 minutes at a time, but she does a lot of fidgeting (Tr. at 1199). Plaintiff can walk through a grocery store, if leaning on a cart, for about 30 minutes (Tr. at 1200). Her parents help her a lot with grocery shopping and laundry (Tr. at 1200). Often she is in

15

so much pain that she doesn't leave her house, or she is so fuzzy-headed that there is no way she can drive (Tr. at 1200). Plaintiff can pick up her cat, who weighs 15 pounds (Tr. at 1200). She can cradle him and walk around with him for about 3 or 4 minutes (Tr. at 1200). If she had to lift something more than 3 or 4 times per hour, she would be limited to 5 pounds (Tr. at 1200-1201). Fibromyalgia causes muscle fatigue -- even when she holds her cat for 3 or 4 minutes, it feels like she has been doing arm exercises for 2 hours (Tr. at 1201).

Plaintiff had carpal tunnel release surgery on both hands in the summer of 2012 which alleviated some of the tingling and other issues (Tr. at 1201). But she was told her muscles are dead so she will never have the strength back (Tr. at 1201). She used to play the piano and the clarinet, but she cannot do those things anymore (Tr. at 1201). She is capable of using a keyboard, but not for more than 5 or 10 minutes at a time (Tr. at 1201).

Plaintiff continues to have migraines (Tr. at 1201). She started BOTOX treatment for migraines the last day of June 2014 (Tr. at 1202). She was eligible for that because her migraines were considered chronic -- more than 16 a month (Tr. at 1202). Plaintiff was having closer to 25 or 30 migraines per month (Tr. at 1202). She has only had 2 BOTOX treatments so far (Tr. at 1202). She continues to have auras every day (Tr. at 1202). She treats her migraines with sleep -- she has been taking Sumatriptan for 10 or 15 years, and she also takes Tizanidine, a muscle relaxer (Tr. at 1202). She will take Zofran with those medications and lie down for an hour or two (Tr. at 1203). Imitrex causes nausea (Tr. at 1202).

16

In 2011 plaintiff was diagnosed with gastroparesis -- her stomach does not empty like it should (Tr. at 1203). That caused the chronic nausea, vomiting and diarrhea (Tr. at 1203). Plaintiff took a medication that was not approved in the United States -- her doctor recommended it and told her how to get it (Tr. at 1203). She took it for a year and a half, but it was cost-prohibitive so she stopped (Tr. at 1203). She tried several other medications, Erythromycin (antibiotic) and Reglan (treats gastroesophageal reflux disease ("GERD")), but those did not work (Tr. at 1203). Plaintiff's symptoms caused her to use the restroom frequently (Tr. at 1203). Recently she only has diarrhea issues once every couple of weeks -- now she has constipation mostly (Tr. at 1203). Vomiting is no longer an issue (Tr. at 1204). She had lap band surgery in February 2012 which helped with some of those issues but caused new problems (Tr. at 1204).

Plaintiff continues to have difficulty sleeping (Tr. at 1204). She feels fuzzy-headed and muddled, and she has difficulty with even simple tasks (Tr. at 1204). She gave up driving three years ago because she was so sleep-deprived that she was going to the grocery store without being aware that she had gone (Tr. at 1204). Her parents have provided transportation to doctor appointments and the grocery store -- the only two places plaintiff goes (Tr. at 1204-1205). A year ago a sleep doctor put her on Modafinil which is to keep her awake and focused during the day (Tr. at 1205). Although that medication was working well for her, a month earlier it was suspected that she may be narcoleptic and she is scheduled for testing in January (Tr. at 1205). Modafinil helped her not be asleep -- "I'm still groggy, I'm still sleepy, but I'm not asleep,

which is what I think I probably was before. I mean I think that I was, was just not -- I couldn't function because I was so sleepy. I wasn't aware of what I was doing. The Modafinil improved that dramatically in that if I think I'm going to go to the grocery store, and I have somebody to go to the grocery store with, then I can actually get there and get some things purchased and get home. Prior to that, I may have come home with things I didn't use." (Tr. at 1205-1206). Plaintiff takes naps every day for 1 to 3 hours (Tr. at 1206).

When it gets too warm, plaintiff's asthma causes her to cough (Tr. at 1206). Cold, damp weather is difficult for her because of the fibromyalgia (Tr. at 1206). Any change in temperature causes a migraine (Tr. at 1206).

Plaintiff can do household chores and take care of her home, but her parents help her (Tr. at 1207). She does dishes once a week (Tr. at 1207).

Plaintiff's Imitrex (Sumatriptan) for migraines causes nausea (Tr. at 1207). Most of the medications she takes except Provigil cause drowsiness (Tr. at 1207). She sees a doctor on average once a week (Tr. at 1208). Plaintiff has trouble finding doctors that treat Medicaid patients in Clay County where she lives (Tr. at 1208-1209). Plaintiff lost her spousal support in May 2013 which has caused money problems with medications and treatments (Tr. at 1209).

**Stella Doering.** Vocational expert Stella Doering testified at the request of the Administrative Law Judge. Plaintiff's past work consists of child welfare case worker, SVP 7, light; community and family support officer, SVP 8, sedentary; middle school teacher, SVP 7, light; pharmacy technician, SVP 3, light (Tr. at 1209-1211).

The first hypothetical involved a person who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk a total of 6 hours per day; sit for 6 to 8 hours per day; cannot work under extremes of temperature; cannot work under conditions where there are concentrated airborne irritants; cannot work under conditions where there is excessive wetness and humidity; cannot work above shoulder level; cannot limb ladders, ropes or scaffolds; cannot crawl, work at unprotected heights, or forcefully grasp or twist; can perform ordinary manipulation with both hands without limitation; is limited to repetitive work which is simple and unskilled, no higher than an SVP of 2 (Tr. at 1211). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 1211). Such a person could work as a router, DOT 222.587-038, light, SVP 2, with 1,000 jobs in Missouri and 42,000 in the country; a collator operator, DOT 208.685-010, light, SVP 2, with 800 in Missouri and 52,000 in the country; or folding machine operator, DOT 208.685-014, light, SVP 2, with 1,100 in Missouri and 43,000 in the country (Tr. at 1211).

The second hypothetical was the same as the first except the person would be unfocused and off task 10 to 15 percent of the time (Tr. at 1212). The vocational expert responded, "Well, the Department of Labor considers an 85 percent productivity rate to be normative, and 10 to 15 percent is within that. So, while it might reduce the numbers slightly, it would not preclude full time, competitive work." (Tr. at 1212). If a person were off task 20 percent of the time, she could not work (Tr. at 1212).

The third hypothetical was the same as the first except the person, due to debilitating pain, would need to take breaks 15 minutes out of every hour (Tr. at 1212).

Such a person could not work (Tr. at 1212).

If a person were to miss work 3 or more times a month, the person could not work (Tr. at 1213). If the person in the first hypothetical needed to shift positions from sitting to standing every 15 minutes, the person could still perform sedentary jobs (Tr. at 1213). If the person would need to leave the work station every 5 or 10 minutes such that it interfered with productivity, it would become problematic (Tr. at 1213).

## C.   SUMMARY OF MEDICAL RECORDS

Plaintiff's medical history, as well as the ALJ's reasoning for giving each source particular weight, is as follows (more detailed records are discussed elsewhere in this order):

In reviewing this case again, the undersigned finds that the evidence cited in the original decision continues to be pertinent and relevant. A treating physician of the claimant has been Thomas Chapman, D.O., and he affirms a history of fibromyalgia, depression, insomnia, and sinusitis. Dr. Chapman also noted a history of back and hip pain, and MRI scans of the claimant have shown disc protrusions in the lumbar and thoracic spine. Moreover, Dr. Chapman has assessed the claimant with cervical radiculopathy and muscle spasms.

Despite these conditions, however, a neurologic treatment report completed on October 27, 2008, indicated that the claimant could ambulate without difficulty. In addition, clinical notes from April 2009 showed that cardiovascular, respiratory, cognitive, and neurological functioning were normal during this period. The claimant, however, continued to complain of pain, which Dr. Chapman related to fibromyalgia.

20

In July 2010, pain management specialist, Steven Simon, M.D., treated the claimant and assessed her with significant deficits. Dr. Simon assessed the claimant as disabled with a diagnosis of flbromyalgia. Specifically, Dr. Simon assessed the claimant with fibromyalgia with a chronic pain syndrome. The doctor prescribed medication to help the claimant manage her pain.

Throughout 2010, the claimant . . . continued to complain of pain and doctors prescribed various medication combinations in an effort to manage the claimant's pain. In late 2010, the claimant also received physical therapy for bilateral hip, pelvis, and spinal pain. In December 2010, doctors at the facility discharged her from therapy due to non-compliance. She had cancelled or had been a no show to her last five appointments.

On June 10, 2011, Kent Kwas Huston, M.D., a rheumatologist, examined the claimant. The claimant stood 5 feet 8 inches tall and weighed 273 pounds. She had full range of motion in upper and lower extremities, normal proximal muscle strength, symmetric reflexes, and normal distal pulses. She displayed diffuse soft tissue tender points in the neck, trapezius, paraspinal muscles, and upper and lower extremities. Dr. Huston opined the claimant's symptoms and history were consistent with a diagnosis of fibromyalgia; however, the doctor detected no evidence of autoimmune rheumatic disease. X-rays of the low back and pelvis revealed normal alignment and disc spaces. The x-rays, however, revealed degenerative changes in the lower lumbar facet joints. Dr. Huston also noted that the claimant was using multiple pharmacies to obtain medication and he was concerned about the potential for adverse effects. The doctor suggested that the claimant start weaning herself off these medications to see if they were really providing any benefit.

During this same period, Dr. Hon treated the claimant for headache pain and sleep problems. The claimant was taking numerous medications and she reported no significant side effects from them. The claimant, during this examination, also displayed full upper and lower extremity strength proximally and distally. She also had normal muscle tone and muscle bulk in motor function in all extremities. Additionally, her gait was normal and she was able to stand and ambulate without difficulty.

Despite relatively benign findings, Dr. Hon completed a Physician's Residual Functional Capacity Form on September 6, 2011 in which the doctor opined the claimant cannot lift 10 pounds, cannot stand, sit, or walk for even an hour, and cannot use her hands, legs, or feet, in performing work activities. She further opined the claimant must lie down and recline and should never bend, squat, stoop, crouch, crawl, kneel, climb, reach, or be required to maintain balance. She noted the claimant's limitations against unprotected heights, being around moving machinery, and against exposure to marked changes in temperature and humidity is severe. Dr. Hon reported the claimant has severe pain due to uncontrolled migraines and fibromyalgia, and that she has significant cognitive dysfunction due to these factors as well as severe insomnia and medications.

In an effort to understand the claimant's condition more thoroughly, Ann Winkler, M.D., reviewed the claimant's records and assessed functioning at the first hearing. Dr. Winkler agreed with a diagnosis of fibromyalgia; however, the doctor also noted that on several occasions, the claimant was tender all over, which usually suggests that there are significant psychological issues related to the claimant's perception of pain. Overall, Dr. Winkler opined the claimant should be able to do light duty work. Specifically, the medical expert opined that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, and stand or walk six hours out of an eight-hour day without limitation

22

in sitting. The doctor also opined the claimant could occasionally climb stairs, should never climb ladders, ropes or scaffolds, can frequently balance, and only occasionally kneel, crouch, stoop, and bend. She found no manipulative, visual, or communicative limitations, but found the claimant would need to avoid concentrated exposure to cold, wetness, humidity, dust, fumes, odors and gases, and need to avoid unprotected heights. Dr. Winkler further noted that the record contains evidence that the claimant did improve with physical therapy although she was not compliant with continuing physical therapy. She felt that the claimant's psychological problems do affect her in terms of ability to function on a regular basis but cannot say how much because she is not a psychologist.

From a psychological standpoint, the claimant has generally maintained normal mental status during non-psychiatric examinations. Her psychiatric exam was normal during an emergency room visit for chest pain in April 2009. In addition, during a July 2011 neurologic examination, the claimant's mental status was normal. She was grossly oriented to person, place and time and her attention and concentration abilities were normal. Her recent and remote memory were intact. Her judgment and insight were intact and her mood and affect were normal.

The record indicates she began receiving mental health counseling in May 2009 with Christina Lenon, a licensed professional counselor. Ms. Lenon indicated in a letter dated April 1, 2010, that she is counseling the claimant, pro bono, to help her deal with depression and anxiety over her divorce and health problems. According to Ms. Lenon, the claimant has had to cancel 50% of their sessions because she was not able to get out of the bed from severe muscle pain and fatigue. Ms. Lenon noted that the claimant seems to be a naturally outgoing person limited by her physical symptoms. Based on her sessions with the claimant, Ms. Lenon opined that it is doubtful that the claimant is capable of

23

consistently fulfilling the obligations of a steady job in the foreseeable future because of her physical condition. Her impaired level of functioning seems to be a result of physical problems and chronic pain caused by fibromyalgia.

On August 27, 2010, the claimant began receiving counseling from Synergy Services. Her therapist, R. Elizabeth Johnson, reported in a letter dated March 6, 2011, that the claimant's treatment was because of her social isolation and dependence on others for care. She noted that the claimant has had to cancel on days that she is unable of get out of bed. The claimant's goals are to learn ways of managing pain, and addressing the depression that comes from being isolated from her goals of working and having friendships. Leslie Jones, Ph.D., a psychologist with Synergy, also submitted a letter discussing the claimant's condition dated July 15, 2011, however the letter indicates that Dr. Jones is not the claimant's treating therapist or psychologist but is only filling in until Ms. Johnson returns from medical leave. Dr. Jones reported the claimant's diagnoses are adjustment disorder with depressed mood, chronic; pain disorder associated with a psychological and a general medical condition; and a Global Assessment of Functioning ("GAF") of 30. The doctor also noted that the claimant had made good progress towards accomplishing her treatment goals in individual therapy.

The claimant underwent a neuropsychological evaluation on December 3, 2010, conducted by Terrie Price, Ph.D. due to alleged memory loss. The claimant reported she had difficulty with concentration and a tendency to say the wrong word for the last three to four years. She also reported difficulty with recall. The claimant reported a history of physical, sexual, and emotional abuse by her ex-husband, which has resulted in her experiencing nightmares, flashbacks, intrusive thoughts, and avoidance of some people. The claimant reported being independent in household tasks, mostly sleeps through the night, and not

24

sleeping during the daytime. The claimant reported her mood is good when she feels well and even when she is not well. The claimant reported that when she left her parents and moved on her own six weeks before the evaluation, she has felt better than she had for years. She denied symptoms of depression and has recently returned to social activities, meeting more people in the community. She acknowledged worrying but denied anxiety or panic attacks. Dr. Price noted that the claimant had a flat affect and that she was somewhat tearful, especially about domestic abuse issues. The claimant developed a headache beginning at the middle of the assessment so the examiner turned the lights off. She was otherwise even in affect and gave good effort overall. The claimant's testing results revealed above average intellectual functioning with a Full Scale Intelligence Quotient ("IQ") of 99, normal verbal intellectual functions, average to slightly lower average visual spatial skills, mild delay in word fluency and generation under speed conditions, mild difficulty in spatial abstraction and mechanical manipulation of blocks and arranging blocks. Memory test functions were at an expected level, and the claimant was able to recall details from two short stories after one presentation and recall stories after a brief delay. Attention-based measures were generally average and verbal abstract reasoning and concept formation were average. The claimant did evidence mild difficulty in completing complex patterns of mental flexibility and mental shifting; however, psychomotor and mental processing speed was in the average range. In self-report inventories, the claimant acknowledges moderately severe symptoms associated with depression and severe symptoms associated with anxiety, but in the interview, she does not acknowledge the same degree of symptoms. Factors that contributed to her test performance included emotional distress and the interfering impact of pain. Overall, Dr. Price opined the claimant showed cognitive capacity for completing the majority of activities in her daily life, although, during times of emotional distress and pain, it could be more challenging to pay attention to details. The doctor opined that the claimant might

have difficulty with word production under pressure, but with ample time, the doctor reported that the claimant appeared to have the vocabulary skills to express herself.

Since the appeal of her unfavorable decision, the claimant has undergone further medical treatment. In July 2012, [a] doctor performed carpal tunnel release on the right. Doctors followed this with a carpal tunnel release surgery on the left in August 2012. In February 2013, the claimant, who was obese, underwent lap band surgery. She tolerated the procedure well, but needed a revision/ adjustment in June 2014. In late 2014, Dr. Jones and Dr. Hon submitted new evaluations regarding the claimant's functioning. Although the above-cited treatments/procedures appeared to have improved overall condition/functioning of the claimant, both Dr. Jones and Dr. Hon, as they had in the past, indicated that the claimant was struggling and overwhelmed by medical problems. Dr. Jones, who does not appear to have even treated the claimant, indicated that her mental symptomatology (GAF 45) was serious and that she had deficits related to an adjustment disorder, pain disorder, and past domestic abuse. In discussing the claimant's condition/functioning, Dr. Jones often incorporated statements made by the claimant into [her] evaluation. Dr. Jones, however, provided little, if any, independent assessment of the claimant's abilities/ functioning. Moreover, the doctor provided no clinical support for [her] conclusions. Similarly, Dr. Hon only completed a questionnaire about the claimant's physical functioning and did not provide clinical support for her findings. In his evaluation, Dr. Hon opined that the claimant could lift and carry less than 10 pounds and that she could only stand and walk for 1 hour in an eight-hour workday. The doctor also precluded the claimant from many postural activities and indicated that the claimant's condition and treatment would cause her to be absent from work more than three times a month. Such limitations, however, do not comport [with] the overall record. Moreover, they do not

comport with Dr. Hon's own treatment notes. Therefore, the opinions of Doctors Jones and Hon are given very little weight.

In reassessing the other opinions in this case, the undersigned draws essentially the same conclusions as made in the first decision. Dr. Simon, the claimant's pain specialist, previously indicated that the claimant was disabled. The undersigned again notes, however, that finding an individual disabled under SSA is reserved to the Commissioner and is never entitled to controlling weight or special significance. Thus, the undersigned, although not ignoring this opinion, gives it little weight and does not find it to be controlling.

The undersigned, as was done previously, also finds that the opinions of Ms. Lenon and Ms. Johnson, as counselors, are not "acceptable medical sources" since they are not licensed physicians or licensed psychologists. As "other sources," however, the undersigned has considered their opinions in determining the severity of the claimant's impairments as well as in considering how her impairments affect her ability to work. This is consistent with SSR 06-3p (20 CFR 404.1513(d), 416.913(d)). As discussed previously, the undersigned again notes that an acceptable medical source, Dr. Jones, did complete an evaluation of the claimant on behalf Ms. Johnson. This doctor, however, wrote the opinion as a substitute provider and relied completely upon the findings of Ms. Johnson, who is not an acceptable medical source. Dr. Jones reported no meetings with the claimant. The undersigned also notes that even if Dr. Jones was finding these deficits [herself], the available medical evidence does not support [her] findings. Reports from Dr. Hon as well as Dr. Jones' own clinical notes do not support the severity of deficit opined by Ms. Lenon and Ms. Johnson.

In addition to reaffirming the weight given to the above opinions, the undersigned also reaffirms that the undersigned is giving more weight to the opinions of Dr.

Price as compared to Dr. Hon. The undersigned also affirms giving great weight to the conclusions of Dr. Huston, a past rheumatologist of the claimant. Furthermore, the undersigned gives significant weight to the opinions of Dr. Winkler, a medical expert who testified at the first hearing. The undersigned finds the testimony of Dr. Winkler persuasive with regard to the mental functioning of the claimant. The undersigned also notes that the medical expert is a specialist who is familiar with Social Security Administration policy and Regulations. Moreover, she had the opportunity to review the complete documentary record as of the date of the first hearing.

(Tr. at 1177-1182).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge George Bock entered his opinion on January 15, 2015 (Tr. at 1172-1184). Plaintiff's last insured date was December 31, 2009 (Tr. at 1174).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date, January 18, 2006 (Tr. at 1174). Although she did work after this date, her work activities were very limited (Tr. at 1174).

Step two. Plaintiff has the following severe impairments: fibromyalgia, obesity, depression/adjustment disorder, asthma, and shoulder impingement (Tr. at 1174). Plaintiff's migraines are not severe because the records reflect that they are stable and controlled with medication (Tr. at 1175). Plaintiff's doctor suspected plaintiff's memory complaints were caused by medication side effects (Tr. at 1175). Once plaintiff's medications were modified, she reported doing well and her neurological exam was normal (Tr. at 1175). Plaintiff's history of pituitary nodule is non-severe because it does not affect plaintiff's functioning or ability to work (Tr. at 1175). Plaintiff's insulin

resistence is non-severe because it has remained stable over the years with medication (Tr. at 1175). Plaintiff's alleged irritable bowel syndrome is not supported by the medical records and does not affect her functioning (Tr. at 1175). Plaintiff's right shoulder tendon tear is not a severe impairment because plaintiff was released from physical therapy due to non-compliance, she missed follow up appointments due in part to work conflicts, and the difference in shoulder strength -- right compared to left -- was not particularly significant (Tr. at 1175).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 1176-1177).

Step four. Plaintiff retains the residual functional capacity to perform light work. She can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. She can stand or walk 6 hours per day. She can sit for 6 hours per day. She cannot work under extremes of temperature, with concentrated airborne irritants or in an environment with excessive wetness or humidity. She cannot perform work above shoulder level and she cannot climb ladders, ropes or scaffolds. She cannot crawl, work at unprotected heights, or forcefully grasp or twist with her hands. She can perform ordinary manipulation with both hands without limit. She is limited to repetitive, routine work that is simple and unskilled, and cannot perform work with an SVP of anything higher than 2 (Tr. at 1177). With this residual functional capacity, plaintiff cannot perform any of her past relevant work (Tr. at 1177-1183).

Case 4:15-cv-00283-REL   Document 33   Filed 09/26/16   Page 29 of 61

Step five.  Plaintiff is capable of performing other jobs in significant numbers in the economy, such as router, collator operator, and folding machine operator (Tr. at 1183).  There she is not disabled (Tr. at 1184).

## VI.    THIRD PARTY OBSERVATIONS

Plaintiff argues that the ALJ erred in dismissing plaintiff's parents' statements because they purportedly had a pecuniary interest in the matter and therefore lacked objectivity.

The ALJ is obligated to consider third party information and observations in determining a claimant's ability to perform work-related activities.  20 C.F.R. § 404.1513(d)(4).  Evidence from non-medical sources is to be evaluated using factors such as the nature and extent of the relationship to the claimant and whether the evidence is consistent with other evidence of record.  SSR 06-3p.  Social Security Ruling 06-3p clarified how SSA considers opinions from sources who are not what the agency terms "acceptable medical sources."  SSA separates information sources into two main groups:  "acceptable medical sources" and "other sources."  It then divides "other sources" into two groups:  medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).  Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.  20 C.F.R. § § 404.1513(a), 416.913(a) (2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.    Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.      Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.      Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

In general, according to the ruling, the factors for considering opinion evidence from "other sources" include:

• How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

Not every factor will be applicable in every case. "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-3p. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id.

The ALJ had this to say about the statements of plaintiff's parents (summarized above at pages 8 and 9), which were discussed in conjunction with the analysis of plaintiff's credibility:

The claimant indicates she is overwhelmed by medical difficulties in this case. The claimant complains of chronic pain and indicates that she often must stay in bed. She also has told doctors this and she reports that she often misses appointments because she cannot get around physically. Questionnaires completed by the claimant's mother and father buttress these assertions of the claimant. The claimant's mother and father both indicate that the claimant does little during a typical day and both indicate that the claimant often spends extensive amounts of time in bed.

As discussed above, the claimant does have some genuine difficulties with chronic pain (fibromyalgia). She also struggles with her weight and she has a shoulder impingement. The claimant also has a history of asthma and depression. In combination, these conditions do take a toll on the claimant. Treatment and medication, however, have helped the claimant over the years. Moreover, since the prior unfavorable decision, the claimant had undergone bilateral carpal tunnel release surgeries as well as lap band surgery. These release surgeries have improved the claimant's upper extremity functioning and the lap band surgery has helped the claimant to begin the process of managing her weight. Recent records also do not show physical deficits (can only stand and walk 15 minutes) alleged by the claimant.

The undersigned also notes that many of the claimant's complaints are subjective and lack objective support in the record. Moreover, the claimant has shown a tendency to complain about medical problems (injuries as well as aches and pains) that lack a known etiology.

Overall, the undersigned does find the claimant to have deficits. She is limited by pain and she does not have the mental focus to perform complex or detailed tasks, but as previously discussed, the claimant can perform simple repetitive type tasks as well as light exertional level activities. Some doctors have asserted otherwise, but, as discussed above, their evaluations are not persuasive, and the undersigned gives more weight to the opinions of physicians, like Dr. Price and Dr. Winkler. The undersigned also notes that the claimant's parents have a pecuniary interest in the case and lack objectivity. Thus, although considering their reports, the undersigned gives them little weight.

(Tr. at 1182).

Plaintiff's specific arguments with respect to the ALJ's consideration of the statements of plaintiff's parents are as follows:

> Plaintiff cannot imagine the ALJ's cursory dismissal of the third party statements constitutes the consideration of the substantial evidence that was anticipated by the Court when it remanded this matter.  The ALJ dismissed the parents' statements because they purportedly had a pecuniary interest in the matter and, therefore, lacked objectivity.  This does not in any manner address the factors the ALJ was required to consider pursuant to SSR 06-3p.  Most disconcerting, the ALJ's conclusion is factually incorrect!  Plaintiff testified her source of support through May of 2013 had been from her ex-spouse.  She further testified she no longer lived with her parents and it was just her and her cat.  Plaintiff lives in a home with other residents.  There is no evidence supporting the ALJ's conclusion [that] Plaintiff relied on her parents financially and/or that they had a pecuniary interest in their daughter's receipt of benefits.

(plaintiff's brief, p. 58-59).

Contrary to plaintiff's argument, the ALJ adequately addressed the SSR 06-3p factors.  As quoted above, SSR 06-3p requires the ALJ to consider the statements, but it does not require the ALJ to explain in detail how he considered those statements: "[T]here is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision".  SSR 06-3p.  The ALJ is to explain generally the weight given to opinions from these other sources, or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning.  The ALJ did just that.  He gave the statements of plaintiff's parents little weight because the parents have a pecuniary interest and lack objectivity.  Despite plaintiff's assertions to the contrary, she stated under oath in her financial affidavit in support of her motion to proceed in forma pauperis that her parents assist her financially.  See document 1, page 7.  She told her counselor Christina Lenon that "her financial constraints have necessitated that she live with her parents" (Tr. at 722).  She told another counselor,

34

Elizabeth Johnson, that it is difficult for her "to be dependent on her family for her care: both financially and with daily tasks" (Tr. at 865). In addition, plaintiff's testimony was that her parents cook for her, clean for her, help her bathe, take her to appointments, take her shopping, etc. It is clear that her parents have an interest in plaintiff obtaining benefits if for no other reason than to help reduce her dependence on them for all of these things.

## VII.   *RESIDUAL FUNCTIONAL CAPACITY*

Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity because he did not properly consider plaintiff's obesity.

> The ALJ found Plaintiff to have a "severe" impairment of obesity. (Tr. 1174). The ALJ acknowledged a "severe" impairment to be one which "significantly limits an individual's ability to perform basic work activities." (Tr. 1173). The ALJ then merely states "the claimant's excess weight has been considered in arriving at the above-found residual functional capacity based on the totality of the evidence." (Tr. 31). This is insufficient.

(plaintiff's brief, p. 60).

Defendant accurately pointed out that plaintiff cited from two different ALJ opinions -- and the criticism of the ALJ merely stating "the claimant's excess weight has been considered" applies only to the October 11, 2011, opinion, not the one that is the final decision of the Commissioner dated January 15, 2015.

In addition to her argument regarding the treatment of her obesity, plaintiff argues that (1) the ALJ should not have given controlling weight to the opinion of Dr. Ann Winkler because she did not review the administrative paperwork, she did not hear plaintiff's testimony, and she did not review the medical evidence submitted after her

35

testimony and after the case was remanded, (2) the ALJ should have given controlling weight to plaintiff's treating neurologist Dr. Sarah Hon, (3) the ALJ should not have discredited the opinions of Ms. Lenon and Ms. Johnson, (4) the ALJ should not have discredited the opinion of Dr. Jones, and (5) the ALJ should not have discredited the opinion of Dr. Simon.  Although plaintiff's argument purports to be that the ALJ erred in failing to consider her obesity, she concludes this argument with a recitation of plaintiff's mental condition; and points out that Dr. Hon's opinion was based on migraine pain, fibromyalgia and medication side effects; and points out the Dr. Simon's opinion was based on fibromyalgia.

## A.    OBESITY

I begin by pointing out an observation -- plaintiff has failed to indicate in her brief what functional restrictions are caused by her obesity that the ALJ failed to consider.  I also note that plaintiff's testimony does not include any functional restrictions based on her obesity.

> "'We have held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal.'" Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) (quoting Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004)).  The ALJ explicitly stated that he "considered the combined effects of the claimant's obesity with the claimant's other impairments when determining that he retains the ability to perform a range of sedentary work within the limitations identified."  As we have discussed above, the ALJ properly considered the record as a whole.  Wright's disagreements with the ALJ's conclusions made from its review of the entire record do not mean the ALJ did not consider the whole record.

Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015).

In his 2015 decision, the ALJ did consider plaintiff's obesity -- he referred to her weight in his severity discussion, he noted her weight of 273 pounds in discussing Dr. Huston's June 2011 physical examination (which included her weight and her range of motion, muscle strength, etc.), and he referred to plaintiff's successful lap-band surgery. Plaintiff's citation to an unpublished district court opinion is not persuasive. The ALJ's opinion in this case comports with the requirements of Eighth Circuit case law.

## B. DR. ANN WINKLER, MEDICAL SPECIALIST

Plaintiff argues that the ALJ should not have given controlling weight to the opinion of Dr. Ann Winkler, a rheumatologist, because she did not review the administrative paperwork, she did not hear plaintiff's testimony, and she did not review the medical evidence submitted after her testimony and after the case was remanded.

After reviewing the full medical record up to that point, Dr. Winkler testified at the September 2011 hearing that plaintiff did indeed suffer from fibromyalgia, along with what Dr. Winkler called "significant psychological issues" which played a part in her perception of pain. Dr. Winkler concluded that plaintiff could perform "at least light-duty work," and had the ability to stand or walk for 6 hours per day and sit for an unlimited amount of time. Noting that Dr. Winkler was a specialist who is familiar with Social Security policy and regulations, the ALJ gave significant weight to her medical opinion.

"It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004). See also Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006) ("The regulations specifically provide that

the opinions of non-treating physicians may be considered.") (citing 20 C.F.R. § 404.1527(f)).  Plaintiff's argument that Dr. Winkler did not review medical records submitted after remand is not persuasive -- Dr. Winkler reviewed all of plaintiff's medical records spanning 5 1/2 years after her alleged onset date.  Her opinion was relevant to the ALJ's determination and the ALJ properly discussed his reasons for assigning Dr. Winkler's opinion great weight.

**C.    *DR. SARAH HON, NEUROLOGIST***

Plaintiff argues that the ALJ should have given controlling weight to the opinion of plaintiff's treating neurologist Dr. Sarah Hon.  Below is a summary of all of Dr. Hon's medical records:

On January 15, 2004, plaintiff saw Sarah Hon, D.O., of Northland Neurological Associates (Tr. at 756-758).  Plaintiff reported headaches dating back to her early 20s which became more frequent as she neared 30.  Plaintiff was not working outside the home.  On exam coordination was excellent, gait was "completely normal with excellent tandem heel and toe walking."  Her memory was "excellent."

On January 22, 2004, Dr. Hon's exam revealed normal memory, coordination and gait (Tr. at 751).

On September 16, 2004, plaintiff saw Dr. Hon for a follow up on headaches (Tr. at 749).  On exam plaintiff had normal memory, coordination and gait.

On January 31, 2005, plaintiff saw Dr. Hon for a follow up on headaches (Tr. at 505, 642, 748).  On exam plaintiff's coordination, gait and memory were all normal.

January 18, 2006, is plaintiff's alleged onset date.

On February 10, 2006, plaintiff saw Dr. Hon for a follow up (Tr. at 504, 641, 747). It had been more than a year since plaintiff's last appointment with Dr. Hon. Plaintiff reported that her only problem with headaches during that time had been during a four-month period due to her oral contraceptive medication. "She is hoping that in the next few months she will be able to try becoming pregnant." On exam plaintiff's memory was normal. Her coordination and gait were normal. "In summary, I am pleased that overall Emily is doing very well from the standpoint of headaches."

On March 24, 2008, plaintiff saw Dr. Hon "on a rather urgent basis regarding memory loss and migraine" (Tr. at 502-503, 633-634, 739-740). Plaintiff had not seen Dr. Hon in more than two years. "[S]he really has done fairly well with regard to migraine up until the last year or so. She states that, for the last year, she has had significant problems with short term memory deficits, difficulty putting words together when they should be separate, difficulty with word finding." Plaintiff's recent laboratory studies were all normal. The MRI of her head done on February 19, 2008, was unchanged from four years earlier and showed a normal brain and ventricular system (Tr. at 510-511, 606-607). On exam, plaintiff's coordination and gait were normal. "I suspect that Emily's short term memory problems are due to medication effect. Certainly, memory loss and speech disturbance are common side effects of Topamax [treats migraines] which the patient is taking at high dosage." Dr. Hon recommended plaintiff decrease her Topamax dose and return in 6 to 8 months unless she was having any problems.

Seven months later, on October 27, 2008, plaintiff saw Dr. Hon for a follow up (Tr. at 499-501, 631-632, 737-738). Plaintiff reported that overall she was doing well. She was sleeping well at night. Topamax was "working nicely as a prophylactic agent for her headache." When plaintiff did develop a headache, Imitrex was working well. Over-the-counter Excedrin Migraine was working well for her milder headaches. Her exam was normal, including her recent memory, remote memory, concentration, and her ability to focus. Coordination was excellent and plaintiff was able to ambulate without difficulty. "I am pleased that overall Emily is doing well from the standpoint of headaches and recommended that she continue taking all of her medications as above."

Plaintiff cancelled her June 29, 2009, appointment with Dr. Hon (Tr. at 499).

Plaintiff cancelled her July 28, 2009, appointment with Dr. Hon (Tr. at 499).

On February 1, 2010, plaintiff saw Dr. Hon (Tr. at 735-736). Her last appointment had been a year and 4 months earlier. Klonopin had been working "beautifully in helping her insomnia" up until last summer and then she "simply discontinued it." On exam plaintiff's recent and remote memory were normal. She was able to concentrate and focus well. She was able to ambulate without difficulty. Her exam was entirely normal. Because plaintiff had gained nearly 30 pounds since beginning Amitriptyline (antidepressant), Dr. Hon suggested she discontinue that and restart Klonopin (anti-anxiety). Plaintiff was to return in 6 months or sooner if she had problems.

Six months later, on August 2, 2010, plaintiff saw Dr. Hon (Tr. at 730-731). Plaintiff reported flashbacks to domestic abuse and trouble sleeping. On exam recent and remote memory were normal. Her concentration and focus were normal. Coordination was excellent. Plaintiff was able to ambulate without difficulty. Dr. Hon recommended plaintiff restart Amitriptyline and then later add Savella (antidepressant used to treat fibromyalgia).

On December 22, 2010, plaintiff saw Dr. Hon for a follow up (Tr. at 801-802, 869-870).

> I am pleased to report that since her last clinic visit with me in August, Emily has had significant improvement in her symptoms. After adjusting her medications somewhat in August, she began to develop an increase in her restless leg syndrome. Based on this, we recommended that she add Requip which she is taking. . . . This has helped to control her symptoms quite nicely. Between this and amitriptyline [and] temazepam at bedtime, she has been sleeping very well. She has undergone three physical therapy sessions and definitely believes that this helped her pain significantly. . . . She is taking Savella 50 mg twice daily and she believes that this has also helped her pain tremendously. She is now at least able to be out of bed most of the time. Her headaches seem to be doing well. She only has headaches on an occasional basis. . . . As you know, she continues to have some significant **subjective** cognitive deficits and based on this she is going to undergo neuropsychological testing. . . .
>
> PHYSICAL EXAMINATION: . . . Recent and remote memory appeared intact. The patient was able to concentrate and focus well. The patient was appropriately aware of recent current events. . . . Motor examination revealed excellent strength at 5/5 throughout with normal bulk and tone. . . . Coordination was excellent. . . . The patient was able to ambulate without difficulty.
>
> IMPRESSION AND RECOMMENDATIONS: In summary, although Emily still has significant problems related to fibromyalgia as well as underlying headaches and insomnia, I am pleased that for the most part she is dramatically improved from when I last saw her in August.

(emphasis added).

Seven months later, on July 19, 2011, plaintiff saw Dr. Hon for a follow up (Tr. at 1073-1076). Dr. Hon noted that plaintiff's migraine headaches had been "fairly well controlled" and that she "has not been having any significant medication related side effects." Plaintiff reported having 2 to 3 migraines per month for the past 6 months, and that her headaches had responded to medication. Plaintiff reported "good general health lately". On exam Dr. Hon noted that plaintiff's attention was normal, her concentration abilities were normal, recent memory was intact, remote memory was intact, her gait and station were normal, she was able to ambulate without difficulty. There were no abnormal findings at all. Dr. Hon assessed fibromyalgia, GERD, insomnia, insulin resistence, obstructive sleep apnea, and pituitary microadenoma -- however, Dr. Hon was not treating plaintiff for any of these conditions, other doctors were. "Overall, Emily has been stable from the standpoint of migraine. I did not make any changes in her medications at this time." She told plaintiff to return in 6 months.

On September 6, 2011, Dr. Hon completed a Residual Functional Capacity Assessment (1077-1080). She found that plaintiff could lift less than 10 pounds, even on a one-time basis. She found that plaintiff could sit, stand and walk for less than 1 hour per day. She wrote that plaintiff needs to lie down and recline during the day, but she failed to answer the question regarding how much of the time, although since plaintiff, according to Dr. Hon, could only sit, stand and walk for approximately 1 hour per day, that figure is axiomatic. Dr. Hon found that plaintiff can never bend, squat, stoop, crouch, crawl, kneel, climb, reach or maintain balance. Oddly, although Dr. Hon

42

found that plaintiff can never maintain balance, she also noted that plaintiff does not need an assistive device to ambulate.

Dr. Hon found that plaintiff can never use her right hand, she can never use her left hand, she can never use her right leg, she can never use her left leg. Oddly though, plaintiff has only mild restrictions against driving.

Plaintiff has severe restrictions against being around unprotected heights, being around moving machinery, being exposed to marked changes in temperature and humidity. She has moderate restrictions against exposure to dust and fumes. Dr. Hon wrote that there is objective evidence demonstrating a condition which could reasonably be expected to give rise to plaintiff's alleged degree of pain -- those objective findings of plaintiff's alleged pain are "severe pain" due to migraines and fibromyalgia. Despite the fact that every medical record of Dr. Hon (past and future) reflects normal remote and recent memory on exam and normal attention and concentration, Dr. Hon noted in this form that plaintiff suffers from a short attention span and memory problems which result in plaintiff having no ability to deal with the stress of even "low stress" jobs, no ability to get to work regularly and on time, no ability to be supervised, no ability to remain in the workplace for a full day, and no ability to deal with co-workers or supervisors appropriately. Dr. Hon indicated that she believes plaintiff's impairments or treatment will cause her to be absent from work more than three times a month.

Again, although every record of Dr. Hon (past and future) reflects that plaintiff has no significant side effects from any medication, she noted in this form that plaintiff's medications cause drowsiness, impaired judgment (and all of Dr. Hon's examinations

43

revealed normal judgment), and cognitive impairment. Finally, Dr. Hon indicated that plaintiff has been functioning at this level since October 2006.

On January 17, 2013, plaintiff saw Dr. Hon for a follow up (Tr. at 1495-1497). Plaintiff had not seen Dr. Hon in the past year and 5 months. Plaintiff reported that her migraines had been fairly well controlled; she denied any significant medication related side effects. She reported on average one migraine per week and said her migraines responded to medication.

"Emily continues to have significant cognitive deficits. She remains unable to work." -- this paragraph appears on all of plaintiff's future records despite conflicting with the rest of each record. Plaintiff reported good general health lately. On exam, Dr. Hon noted that plaintiff's attention was normal, concentration abilities were normal, recent memory was intact, remote memory was intact, gait and station were normal, she was able to stand and ambulate without difficulty. There were no abnormal findings on exam. "Overall, Emily is doing okay." She told plaintiff to return in one year for a follow up.

On December 13, 2013, plaintiff saw Dr. Hon for a follow up (Tr. at 1498-1500). Plaintiff's migraine headaches were "fairly well controlled" and plaintiff reported no significant medication related side effects. Plaintiff reported an average of one migraine per week, and her headaches responded to medication. On exam plaintiff's attention was normal, her concentration abilities were normal, her recent memory was intact, her remote memory was intact, gait and station were normal, she was able to stand and ambulate without difficulty. There were no abnormal findings noted in the entire exam.

44

Dr. Hon's assessments were the same. "Overall, Emily's headaches are stable. She is doing fairly well with her current regimen for migraine." Dr. Hon told plaintiff to return in one year.

On May 15, 2014, plaintiff had an MRI of the brain - there were no changes since her last one in January 2012 (Tr. at 1530). That previous MRI had shown only a stable benign nodule on the pituitary gland and a normal MRI of the brain (Tr. at 1532-1533).

On May 30, 2014, plaintiff saw Dr. Hon (Tr. at 1501-1503). According to the record, plaintiff said her migraine headaches had been "fairly well controlled." Yet, she reported an average of 2 to 3 severe migraines weekly and mild to moderate headaches 16 to 20 days per month since her last visit 6 months ago. Her headaches respond to medication. On exam plaintiff's attention was normal, concentration abilities were normal, recent memory was intact, remote memory was intact, gait was normal, she was able to stand and ambulate without difficulty. There were no abnormal findings at all. "I have suggested that Emily try BOTOX for her chronic migraine headaches. She is going to review information about this and will let us know if she'd like to pursue this." No other changes to treatment were made.

On June 27, 2014, plaintiff saw Dr. Hon for BOTOX injections (Tr. at 1518).

On August 18, 2014, plaintiff saw Dr. Hon (Tr. at 1505-1508). Plaintiff reported her migraine headaches had been "fairly well controlled" had that she had "not been having any significant medication related side effects." Her headache history was the same as on the last visit. "She has had significant decrease in the severity of her headaches since her first series of BOTOX injections 6 weeks ago. She believes that

45

the severity has decreased by about 60%." Plaintiff reported getting a moderate amount of exercise (1 to 3 times weekly) and reported "good general health lately". On exam plaintiff had normal attention, normal concentration, normal recent memory, normal remote memory, normal gait. She was able to stand and ambulate without difficulty. Her exam was entirely normal. "I am pleased that Emily has already had some significant benefit from BOTOX injections. We will repeat her injections in 6 weeks from now."

On September 29, 2014, plaintiff saw Dr. Hon (Tr. at 1509-1512). The record reflects that plaintiff's migraines were "fairly well controlled" and that she was having no significant medication related side effects. On exam plaintiff had normal attention, normal concentration, normal recent memory, normal remote memory, normal gait. She was able to stand and ambulate without difficulty. There were no abnormal findings. "I am pleased that Emily has had some significant improvement with her first series of BOTOX. We will go ahead and repeat her series today."

On December 18, 2014, Dr. Hon completed a second Residual Functional Capacity Assessment (Tr. at 1791-1794). Plaintiff's condition had apparently improved since Dr. Hon completed the first assessment on September 6, 2011 -- plaintiff could now sit for 3 hours per day whereas in 2011 she could sit for less than 1 hour per day. She could stand or walk for 1 hour per day whereas in 2011 she could stand or walk for less than 1 hour per day. Plaintiff no longer needed to recline or lie down during the day. She could now occasionally bend, stoop, crawl, climb, and balance, whereas in 2011 she could never do those things. She could frequently reach, whereas in 2011

46

she could never reach.  Plaintiff had only a mild restriction against being around moving machinery (in 2011 that restriction was severe).  Her driving restriction was now moderate, however -- in 2011 is was mild.  Plaintiff continued to suffer from a short attention span and memory problems, although every exam Dr. Hon had ever conducted resulted in a finding that plaintiff's attention and memory were normal.  On this assessment, plaintiff's ability to deal with the stress of a typically low stress job, get to work regularly and on time, be supervised, remain in the workplace for a full day and deal with co-workers and supervisors appropriately was fair (improved from "poor or none" in 2011).  However, her expected absenteeism continued to be more than three times per month.  Plaintiff had no side effects from medication.  This assessment described plaintiff's functional ability since February 2010 -- an overlap of 1 year and 7 months when compared to the last residual functional capacity assessment when Dr. Hon believed plaintiff's restrictions were more severe.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and

other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ discussed the medical records of Dr. Hon and then discredited her residual functional capacity assessment:

> Dr. Hon only completed a questionnaire about the claimant's physical functioning and did not provide clinical support for her findings. In her evaluation, Dr. Hon opined that the claimant could lift and carry less than 10 pounds and that she could only stand and walk for 1 hour in an eight-hour workday. The doctor also precluded the claimant from many postural activities and indicated that the claimant's condition and treatment would cause her to be absent from work more than three times a month. Such limitations, however, do not comport [with] the overall record. Moreover, they do not comport with Dr. Hon's own treatment notes. Therefore, the opinion of [Dr. Hon is] given very little weight.

Although Dr. Hon treated plaintiff for many years, she saw plaintiff only once or twice a year (and sometimes less frequently), the limitations she found (i.e., inability to sit, stand, walk, use her arms, use her hands, use her legs, etc.) have nothing to do with the condition Dr. Hon was treating plaintiff for (migraines). The limitations found by Dr. Hon are not supported by medical signs and laboratory findings; in fact, when asked to provide the objective findings supporting her assessment of plaintiff's pain, Dr. Hon noted only "severe pain" which is not an objective finding. The limitations in her residual functional capacity assessments are not consistent with her own treatment records or with the record as a whole.

The ALJ properly gave very little weight to the opinion of Dr. Hon.

**D.    OPINIONS OF MS. LENON AND MS. JOHNSON**

Plaintiff argues that the ALJ should not have discredited the opinions of Ms. Lenon and Ms. Johnson.  Christina Lenon has a masters degree and is a licensed professional counselor.  R. Elizabeth Johnson has a masters degree and is a licensed professional counselor.

**Christina Lenon.**    On March 31, 2010, Ms. Lenon prepared a psychological status report in support of plaintiff's application for disability benefits (Tr. at 722).  Most of this report either recounts what plaintiff said or makes conclusions regarding plaintiff's physical condition as opposed to her mental condition:

> In 2002 Ms. Hicks was diagnosed with fibromyalgia.  She had worked full time[5] since college primarily in social work jobs.  By 2004 Ms. Hicks reports that she was no longer able to work because of the physical pain caused by her disorder.  She reports that she has not worked since 2004[6] and that her condition has become more severe.  She has to cancel our counseling sessions about 50% of the time because she is not able to get out of bed from severe muscle pain and fatigue.  Her mood and ability to adjust to the emotional difficulties of major life changes seem to be impaired by her physical condition.
>
> * * * * *
>
> Given my experience with Ms. Hicks during our counseling relationship I am doubtful that she is capable of consistently fulfilling the obligations of a steady job in the foreseeable future because of her physical condition.  Her impaired level of functioning seems to be a result of physical problems and chronic pain caused by fibromyalgia.

---

[5]Plaintiff's earnings records do not support this statement.  In 2003 she had no income.  In 2004 she earned just over $8,000.  Additionally, medical records reflect that she told treatment providers she was a housewife.

[6]In 2005 plaintiff earned over $19,000, so this is clearly not an accurate statement.

49

Ms. Lenon did not provide any functional limitations whatsoever that were related to the mental condition for which she was providing counseling.

Plaintiff argues that "the ALJ ignores the fact that . . . Ms. Lenon's treatment notes and opinions are consistent with Dr. Jones' opinions."  (plaintiff's brief, p. 64).  However, plaintiff fails to identify any treatment notes from Ms. Lenon.

Because Ms. Lenon's opinion is based solely on plaintiff's own reports of her of physical limitations, the ALJ properly discounted it.

**Elizabeth Johnson.**  On March 6, 2011, Ms. Johnson prepared a report (Tr. at 865).

> Ms. Hicks sought treatment due to chronic pain and fatigue, which has created social isolation and dependence on others for her care.  Additionally, she was grieving over the end of her marriage. . .

Ms. Johnson noted that plaintiff "reports" suffering from multiple symptoms that create difficulties in functioning daily, including the ability to complete all daily tasks of cooking, hygiene, etc.  She is trying to address the depression that comes from losing her goals of education, employment and socialization.

Although plaintiff argues that the ALJ erred in discounting the opinion of Ms. Johnson, there is no opinion in the record by this therapist.  Indeed there are not even treatment records of Ms. Johnson.  Plaintiff has cited to nothing more than this one-page report that does not indicate that plaintiff has any functional restrictions.

**E.     *OPINION OF DR. JONES***

Plaintiff argues that the ALJ should not have discredited the opinion of Dr. Jones. In giving the "opinion" of Dr. Jones very little weight, the ALJ stated as follows:

50

Dr. Jones, who does not appear to have even treated the claimant, indicated that her mental symptomatology (GAF 45) was serious and that she had deficits related to an adjustment disorder, pain disorder, and past domestic abuse. In discussing the claimant's condition/functioning, Dr. Jones often incorporated statements made by the claimant into [her] evaluation. Dr. Jones, however, provided little, if any, independent assessment of the claimant's abilities/ functioning. Moreover, the doctor provided no clinical support for [her] conclusions.

Following is a summary of the medical records associated with Leslie N. Jones, Ph.D.:

Plaintiff cancelled her appointment with Synergy Services on June 28, 2011; July 5, 2011; and July 12, 2011 (Tr. at 1129). On July 15, 2011, plaintiff's disability lawyer called requesting information for plaintiff's case (Tr. at 1129). A letter was sent that day by Leslie Jones, Ph.D. (Tr. at 1070, 1129).

Ms. Hicks' therapist, Elizabeth Johnson, is currently on a medical leave of absence and I am seeing Ms. Hicks in her absence. . . .[7]

Ms. Hicks has participated in individual therapy for approximately one year. She schedules weekly sessions but is often unable to attend them due to not feeling well. Her treatment plan goals are to explore family of origin dynamics in order to gain insight into how these dynamics impact her current relational functioning and to learn coping skills to assist with pain management and acceptance of her chronic illness. She has made good progress towards accomplishing these goals in individual therapy. Ms. Hicks' diagnoses are:

Axis I:      Adjustment disorder with depressed mood, chronic
             Pain disorder associated with a psychological and a general
                 medical condition
Axis II:     No diagnosis
Axis III:    Fibromyalgia (severe) and sleep apnea, per Ms. Hicks' report
Axis IV:     Psychosocial Stressors: Inadequate finances, problems with
                 primary support, and medical problems

---

[7]There is no evidence in this record that Dr. Jones had ever seen plaintiff at the time she wrote this letter.

51

Axis V:    Global Assessment of Functioning = 30[8]

(Tr. at 1070).

On July 19, 2011, plaintiff said she was frustrated by her inability to remember things lately (Tr. at 1129).  The focus of the session was on journaling.

Plaintiff cancelled her appointment on August 2, 2011, because it was too hot to drive (Tr. at 1129).  She cancelled her appointment on August 5, 2011 (Tr. at 1129).  During her August 9, 2011, appointment, plaintiff displayed a flat affect.  The focus of the session was on plaintiff's "difficulties in her relationship with her manager, who[m] she describes as a 'bully.' . . .  Despite this difficult relationship, she readily described reasons why her work is rewarding and worth keeping."

Plaintiff cancelled her appointment on August 16, 2011, because she was not feeling well (Tr. at 1129).  A week later she reported that she was recovering from a bad bout of stomach flu (Tr. at 1128-1129).  Her affect was flat.  Plaintiff said she was now on very few medications.  She reported that "her primary stressors are that she doesn't have the energy to clean her apartment and she has difficulty with her boss, who tends to be a 'bully' to her."  Plaintiff reported compulsively cutting her hair "to remove the strands of coarse hair."  At the conclusion of this appointment, Dr. Jones noted that plaintiff would not be seeing her anymore since plaintiff's "regular therapist will be returning from leave next week."

---

[8]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

Despite Dr. Jones's note the month before that plaintiff would resume treatment with her regular therapist, plaintiff saw Dr. Jones once more on September 22, 2011 (Tr. at 1127). Plaintiff reported having difficulty sleeping and having muscle pain in her back. Plaintiff's anxiety scale was 2 on a scale of 1 to 10. The focus of the session was on past and current relationships. That same day, plaintiff's disability attorney called Dr. Jones and requested progress notes and documentation to support the summary letter sent to his office two months earlier on July 15, 2011 (Tr. at 1127).

More than three years later, on November 17, 2014, Dr. Jones sent a letter to plaintiff's attorney (Tr. at 1729-1730):

> Ms. Emily Hicks requested a summary of mental health services she has received at Synergy Services, Inc. The following information is provided with her consent.
>
> Ms. Hicks has participated in individual therapy at Synergy Services since 08/27/2010. She also attended our support group for women who have experienced intimate partner violence from July 2012 to July 2013. I facilitated the support group when Ms. Hicks attended it and became her individual therapist on 06/21/2011[9] when Elizabeth Johnson, her previous therapist, went on a medical leave of absence. I have provided individual therapy for Ms. Hicks since that time. . . . [S]he has accepted that she has a condition that causes chronic pain and fatigue. However, her physical problems have hindered her ability to participate in treatment consistently and to meet the demands of daily living. She reports that she often does not feel well enough to leave her apartment for days at a time, which has limited her social support system and increased her feelings of depression and loss. As her physical conditions have become more severe over the past two years, Ms. Hicks is often unable to keep her appointments, although we do keep in contact via phone calls and specifically monitor her symptoms of depression and anxiety.

---

[9]There is no medical record from June 21, 2011.

53

Ms. Hicks' current diagnoses are:

Axis I:     Adjustment disorder with depressed mood, chronic
            Pain disorder associated with a psychological and a general
                medical condition
Axis II:    No diagnosis
Axis III:   Fibromyalgia (severe, digestive problems, and sleep apnea, per
                Ms. Hicks' report
Axis IV:    Psychosocial Stressors:  Inadequate finances, problems with
                primary support, and medical problems
Axis V:     Global Assessment of Functioning = 45[10]

Although a four-page service invoice was attached to the letter showing the

dates of appointments, the amount charged, and the amount paid by plaintiff, no

treatment records were included (Tr. at 1731-1734).

Although plaintiff argues that the ALJ erred in giving Dr. Jones's opinion very little

weight, plaintiff never identifies any opinion provided by Dr. Jones.

A "medical opinion" is a statement from a physician or acceptable medical

source that reflects the doctor's judgments about the nature and severity of an

individual's impairments, including an individual's diagnosis, prognosis, and what the

individual is able to do despite any physical or mental restrictions.  20 C.F.R. §§

404.1527(a) and 416.927(a); SSR 95-5p and 96-2p.  To be entitled to controlling

weight, opinions must come from a treating source and must be well-supported by

medically acceptable clinical and laboratory diagnostic techniques and not inconsistent

with other substantial evidence of record. SSR 96-2p.  Treatment records and test

---

[10]A global assessment of functioning of 41 to 50 means serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious
impairment in social, occupational, or school functioning (e.g., no friends, unable to
keep a job).

results, in and of themselves, are not medical opinions. The medical records and letter cited by plaintiff do not contain a doctor's judgment about plaintiff's functional limitations. Dr. Jones never provided a medical opinion, Dr. Jones's first letter which included plaintiff's diagnoses was written before Dr. Jones had ever seen plaintiff, and Dr. Jones's second letter was written over three years after she had last seen plaintiff according to the records before me. The ALJ created no error with respect to evaluating any of the information provided by Dr. Jones.

## F. OPINION OF DR. SIMON

Plaintiff argues that the ALJ should not have discredited the opinion of Dr. Simon. Steven Simon, M.D., R.Ph., is a specialist in physical medicine and rehabilitation and saw plaintiff once.

On July 1, 2010, plaintiff saw Dr. Simon after having been referred by her primary care physician, Thomas Chapman, M.D. (Tr. at 723-727). Plaintiff denied emotional disorders and arthritis, and she said she does not exercise regularly (Tr. at 726). That same day Dr. Simon wrote a letter to Dr. Chapman:

> Thank you for the kind referral of this pleasant 41-year-old female whom I have seen some years ago for pain problems. She is now disabled with a diagnosis primarily of fibromyalgia that came in 2002. She has had a high intolerance to medications, and has failed with both Cymbalta,[11] although it helped for a while, and Savella[12] which was not tolerated. But she has been on Lyrica[13] 150 mg at bedtime. While this initially helped her sleep, it apparently causes itching and

---

[11]Treats depression, anxiety, diabetic peripheral neuropathy, fibromyalgia, and chronic muscle or bone pain.

[12]Nerve pain medication and antidepressant used to treat fibromyalgia.

[13]Treats nerve pain, muscle pain, fibromyalgia, and seizures.

55

she does not want to take antihistamines to stop it. Other medicines include Topamax,[14] Protonix,[15] tizanidine,[16] metformin,[17] Prenate[18] and Symbicort.[19] She is on temazepam[20] 30 mg for sleep and occasionally will use Imitrex[21] if she has a migraine headache, as well as Ultram,[22] ibuprofen and Proventil inhaler.

\* \* \* \* \*

PAIN DIAGRAM: Shows pain in the head, neck, between the shoulder blades, across the low back, at the knees, ankles, and the hands.

SOCIAL HISTORY: She is now on disability as stated. She is divorced and she is living with her parents. She is independent without the use of device or brace.

REVIEW OF SYSTEMS: Indicates poor sleep. She is quite distraught over this and appears to be quite depressed.

PHYSICAL EXAM: . . . This is an alert and appropriate female standing 5 feet, 8 inches and weighing 273 pounds. She appears to be sad. She is able to stand and walk without difficulty; however, she tends to throw weight from her right side over to the left.

The examination of the legs did not show any significant edema. A concern was that tapping along the spine produced severe pain, and almost anywhere she is

---

[14] Used to prevent migraine headaches.

[15] Treats gastroesophageal reflux disease ("GERD").

[16] Muscle relaxer, also called Zanaflex.

[17] Anti-diabetic medication.

[18] Prenatal vitamin.

[19] Treats asthma and chronic obstructive pulmonary disease ("COPD").

[20] Treats insomnia, also called Restoril.

[21] Treats migraine and cluster headaches.

[22] Narcotic-like pain reliever, also called Tramadol.

touched is painful.  She has skin hypersensitivity.  As such, the FMID[23] could really not be performed accurately in this type of a patient.

The arms do show the presence of myogelosis[24] and she indicated those are some of her hot spots in the mid forearm area.  She describes this as pain, numbness, tingling and weakness of her back, neck, arms and legs that she feels is worsening on a month to month basis in spite of current efforts.  She rates her pain at a 10 on a 0-10 scale.

IMPRESSION:  Fibromyalgia with a chronic pain syndrome, which involves hypersensitivity and depression.  There is a prior history of sleep apnea with a CPAP used at home, and I suspect she is sleep deprived.

PLAN:  We are giving her Nuvigil[25] for her fatigue secondary to poor sleep, a trial of the 150 mg but we will raise her to 250 mg if that is not adequate. . . .  She is going to begin to taper her Lyrica. . . .

At this point, before we add any other pain medications, I want to see how she is doing with this mix.  I am going to ask our pain psychologist to see her and to begin working with her on some cognitive behavioral therapies.  She does have Ultram on board for pain and Voltaren gel,[26] both which should be helpful.  I would like to see her in the next two or three weeks for reevaluation.

(Tr. at 723-724).

Plaintiff argues that "the ALJ erred in rejecting the opinions of Dr. Simon,

Plaintiff's pain specialist, without fulfilling his duty to develop the record.  Dr. Simon

reported Plaintiff was disabled with a diagnosis of fibromyalgia.  The ALJ rejected the

---

[23]I assume this is a reference to some test to determine fibromyalgia, however, I have not been able to confirm this.

[24]An area of abnormal hardening in a muscle.

[25]A medication that promotes wakefulness, used to treat excessive sleepiness caused by sleep apnea, narcolepsy or "shift work sleep disorder."

[26]Used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles or feet.  It contains a non-steroidal anti-inflammatory and  works by reducing substances in the body that cause pain and inflammation.

57

opinion on the grounds it was on an issue reserved to the Commissioner. This triggered the ALJ's duty to develop the record and re-contact Dr. Simon." Plaintiff's argument is without merit.

Dr. Simon's records clearly show that his reference to plaintiff being disabled was in the "social history" section, meaning this is what plaintiff told Dr. Simon or his nurse. Nowhere in his records does he indicate his belief that plaintiff is disabled; in fact, nowhere in his records does it indicate he was ever asked for an opinion about plaintiff's ability to work or any functional ability whatsoever. SSR 96-5p, cited by plaintiff in her argument, states that its purpose is to "clarify Social Security Administration (SSA) policy on how we consider medical source opinions on issues reserved to the Commissioner".

> The regulations provide that the final responsibility for deciding issues such as these [whether a claimant is disabled] is reserved to the Commissioner.
>
> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.
>
> In order for this rule to apply, there must be a "medical source opinion." Clearly

there is not. A "medical opinion" is a statement from a physician or acceptable medical source that reflects the doctor's judgments about the nature and severity of an individual's impairments, including an individual's diagnosis, prognosis, and what the individual is able to do despite any physical or mental restrictions. 20 C.F.R. §§ 404.1527(a) and 416.927(a); SSR 95-5p and 96-2p. Dr. Simon assessed fibromyalgia

58

and prescribed Nuvigil in place of plaintiff's Lyrica, and he told her to return in two or three weeks.  There is no evidence that she ever saw Dr. Simon again.  He never provided a medical opinion, and therefore the ALJ was not required to re-contact him for clarification of his opinion.

## VIII.    CREDIBILITY

Plaintiff argues that the ALJ erred in considering plaintiff's behavior at the hearing in finding plaintiff's testimony not credible.  In support, she points out that "the ALJ's credibility determination in unsupported by the substantial evidence of the record as a whole, including the consistent statements of her parents, Dr. Simon's opinions, Dr. Jones' opinions, Dr. Hon's opinions, Ms. Lenon's opinions, and Ms. Johnson's opinions."

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

59

Contrary to plaintiff's argument, an ALJ is permitted to consider his or her own observations. "The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations." Polski v Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (emphasis in the original). See also Johnson v. Apfel, 240 F.3d 1145, 1147-1148 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."). Furthermore, plaintiff's argument that her discredited testimony is supported by the opinions of Dr. Simon, Dr. Jones, Dr. Hon, Ms. Lenon, and Ms. Johnson is unpersuasive as those "opinions" have been discussed above and are found either to be non-existent or unsupported.

## IX.  ANALYSIS AT STEP FIVE

Plaintiff argues that the ALJ erred in finding that she is capable of performing other jobs because the jobs identified require frequent reaching, and the ALJ found that plaintiff cannot do any reaching or working above the shoulder. Contrary to plaintiff's argument, the ALJ did not find any reaching restrictions. He found only that plaintiff cannot perform work above shoulder level. This argument is wholly without merit.

## X.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

Case 4:15-cv-00283-REL   Document 33   Filed 09/26/16   Page 60 of 61

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 26, 2016